Filed 8/10/15  P. v. Badasso CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ZEWOINESH BADASSO,<br><br>    Defendant and Appellant. | D066122<br><br><br>(Super. Ct. No. SCD243068) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Zewoinesh Badasso murdered her infant son in an episode of child abuse that ended with her strangling him to death.  Following the

murder, defendant placed her son in an alley and claimed he fell to his death from an open window.  Medical examination revealed defendant's ruse and she was arrested, charged, and convicted of first degree murder.

Defendant does not contest her guilt, but claims her conviction should be reduced to second degree murder because the prosecution failed to present substantial evidence that the murder was premeditated.  We disagree, concluding there is substantial evidence in the record from which a reasonable jury could find premeditation.  Affirmed.

FACTUAL OVERVIEW

Defendant murdered her seven-month-old son on September 7, 2012.  Defendant was a single mother, unemployed, and staying temporarily with other Ethiopian immigrants in an apartment in San Diego, California.  At trial, defendant testified her son was conceived from a sexual assault.  Defendant had a history of depression, post-traumatic stress disorder, lack of impulse control, and anger problems for which she had been undergoing psychiatric treatment.  Defendant's ex-husband testified that she had been violent towards him in the past, including biting him and cutting him with a knife.  Shortly before the murder, defendant's depression and anxiety worsened as she was overwhelmed by poverty.

On September 7, a man and a woman were walking past an apartment building where defendant lived when they noticed an infant (the child) lying face down in an alleyway.  The man ran for help while the woman went to see if the child had a pulse.  The child showed no signs of life, and there was no blood on the ground.  While checking for a pulse, defendant appeared before the woman, speaking in broken English and pointing up towards a window and towards the child.  The woman believed defendant

2

was indicating that the child was her baby and that the child fell out of the window. The first police officer to arrive at the scene attempted to resuscitate the child by performing CPR, but the child was unresponsive. The child was transported to a hospital where he was pronounced dead.

Both civilian witnesses and police officers noticed lacerations and bruising around the child's neck. A police sergeant at the scene of the incident concluded the child was likely murdered and defendant staged the accident scene. San Diego police officers detained and briefly interviewed defendant at the scene. She told them she accidently dropped the child out of a third-story window while trying to open it. Both bystanders and police officers noted that defendant was oddly calm and seemed undisturbed by the child's death. Witnesses described defendant picking the child's limp body up by one arm without supporting his head, holding him like a "sack of potatoes." Nobody except defendant and the child were present in the apartment when the murder occurred.

The autopsy confirmed the child died from a combination of manual and ligature strangulation. The pathologist's opinion was based on the number of bruises and abrasions found around the child's neck, eyes and cheeks. Some of these abrasions indicated the use of a ligature. Others appeared to have been made by fingernails. The fingernail marks on the back of the child's neck suggested defendant repositioned her hand while strangling the child, applying pressure, releasing, and then reapplying pressure to the child's neck. The pathologist testified that it generally would take around three minutes of constant pressure around the neck to kill, though much longer if pressure was released and reapplied as appeared to be the case here.

3

The autopsy also revealed a number of other injuries inflicted upon the child prior to or at the time of death. Most of the child's fingernails had been cut or torn off past the quick and into the nail bed, causing the fingers to bleed. Bruising around the ankle indicated that the child had probably been either bound or grabbed forcefully. Various abrasions on the body pointed to the child being dragged across a surface.

A pattern of bruising and burst blood vessels on the child's face showed he had been forcefully struck or stomped on the face. The pattern on the bottom of defendant's sandals matched the pattern of the bruising on the child's face, and DNA from the child was recovered from the sole of one of the sandals. The pathologist stated all of the child's bruising occurred while he was still alive.

The examination also revealed numerous rib fractures and a separation of the spine. According to the pathologist, defendant likely inflicted these injuries by placing one hand under each armpit and squeezing and shaking the child with significant force.

Because there was little bleeding, the pathologist estimated the injuries occurred within an hour of the child's death or soon thereafter. The pathologist testified that the injuries would have taken some time to inflict, perhaps 10 minutes, and that such injuries likely did not result from a fall out of the third-story apartment window.

The defense did not rebut the evidence showing defendant killed the child, but instead based its case on defendant's sanity, or lack thereof. The defense relied upon expert witnesses, defendant's mannerisms at the crime scene, and testimony from defendant that she experienced auditory hallucinations to argue that defendant was in a psychotic state at the time of the murder and did not volitionally kill the child. The

4

defense also argued that the drug trazodone—which defendant was taking to help her sleep—might have triggered a psychotic episode.

In rebuttal, the prosecution called Katherine Dixon, a psychiatrist who treated defendant in jail, and Sheila Wendler, a forensic psychiatrist. Dr. Dixon testified that defendant first reported auditory hallucinations while in jail and might have been coached by fellow inmates. She also prescribed trazodone for defendant while in jail and noted no side effects. Dr. Wendler agreed that defendant fabricated the auditory hallucinations and contended there was no evidence of psychosis. Dr. Wendler also opined that a person in a psychotic state would be unlikely to answer questions lucidly or concoct a story as consistent with the evidence as the story defendant told police.

## PROCEDURAL OVERVIEW

The San Diego County District Attorney charged defendant with first degree murder and assault on a child resulting in death. (Pen. Code,[1] §§ 187, subd. (a) & 273ab, subd. (a).) Criminal proceedings were suspended in October 2012 to evaluate defendant's competency for trial under section 1368. After a jury found defendant competent to stand trial, defendant pled not guilty by reason of insanity.

A jury convicted defendant on both counts in February 2014. A separate jury found defendant sane at the time of the murder. In April 2014, the court sentenced defendant to prison for 25 years to life.

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

5

DISCUSSION

A homicide that is "willful, deliberate, and premeditated" is murder in the first degree. (§ 189.) " 'Deliberation means careful consideration and examination of the reasons for and against a choice or measure.' [Citation.] The verb 'premeditate' means 'To think on, and revolve in the mind, beforehand; to contrive and design previously.' [Citation.]" (*People v. Bender* (1945) 27 Cal.2d 164, 183.) " 'The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[d] an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court identified three types of evidence that can show deliberation and premeditation: (1) planning activity; (2) motive; and (3) "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27.) "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive." (*People v. Pride* (1992) 3 Cal.4th 195, 247.)

We apply a substantial evidence standard of review on the issue of whether there is sufficient evidence in the record to support a finding of premeditation. Specifically, the question before us is whether a reasonable jury could find on this record that

6

defendant killed the child as a "result of preexisting thought and the careful weighing of considerations" when the facts are viewed in a light most favorable to the prosecution. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270.)

Citing to the *Anderson* factors, defendant contends that the prosecutor failed to produce substantial evidence of motive or planning and contends that the manner in which the child was killed does not provide substantial evidence of premeditation. We disagree with these contentions.[2]

Defendant claims that the prosecutor failed to make a case for any specific motive and that the prosecutor instead suggested equivocally that the murder could have been motivated by either an angry outburst or by psychosis. She further claims the prosecutor left it up to the jury to speculate as to what the motive of the murder could have been.

In making this argument, defendant misrepresents what the prosecutor actually said during closing argument. The record shows the prosecutor was not relying on psychosis as a theory as equally valid as any other. Instead, our independent review of the record shows the prosecutor was favorably contrasting her position that defendant killed the child during a fit of rage with the defense's theory that defendant murdered the child while in a psychotic state.

In addition, there is sufficient evidence in the record to support the prosecution's theory. Defendant had a long history of being treated for lack of impulse control and rage issues. Though no evidence of previous child abuse was presented, the record does contain evidence of domestic violence committed by defendant. This evidence, and the

---

[2]     As noted, a jury found defendant was sane and not operating under a psychotic delusion at the time of the murder. Defendant does not contest this finding on appeal.

7

inferences that can be drawn from it, support a finding that defendant killed the child in a fit of rage and thus support the prosecution's theory.

Defendant contends that the circumstances of the crime do not indicate any planned murder. We disagree. The murder occurred not spontaneously in a public place, but rather in her apartment at a time when none of defendant's roommates were present. After the murder, defendant attempted to escape culpability by staging an accident scene. Defendant argues this is not evidence of premeditation because the attempted plan could never have worked because the child's injuries were plainly inconsistent with a fall. Assuming arguendo defendant is correct that the plan was flawed, she cites no case law in support of her contention that to show premeditation the planning activity must have allowed the murderer to avoid detection and apprehension. In any event, we conclude the staging of the accident scene along with the time and location of the murder supports an inference that the murder was planned.

In addition, the manner in which defendant murdered the child supports an inference that she had developed a premeditated intent to kill by the time he finally died. Our high court has held that "[l]igature strangulation is in its nature a deliberate act." (*People v. Bonillas* (1989) 48 Cal.3d 757, 792.) "This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.)

In *People v. Davis* (1995) 10 Cal.4th 463, 510, testimony that strangulation would have taken between one to five minutes to kill the victim was found sufficient to support a finding of premeditated intent to kill. Moreover, our high court has found substantial

evidence of premeditation where a defenseless victim is killed though strangulation following an attack. (See *People v. Bonillas*, *supra*, 48 Cal.3d at pp.792-793 [sufficient evidence of premeditation existed when defendant strangled the victim to death after rendering her unconscious with a blow to the back of the head].)

In the present case, the evidence in the record supports the finding that defendant stomped on her infant son's head with her foot and that she shook and compressed him hard enough to break several ribs and sever his spine. The evidence also supports the finding that defendant cut off the child's fingernails; that she dragged the child across the floor or some other surface leaving abrasions on the skin; and that she killed the child using both her hands and a ligature to strangle him. Moreover, the record includes the testimony of the pathologist. He opined it typically takes about three minutes of constant pressure on the neck to kill a victim. However in this case, the pathologist opined it likely took longer than three minutes because the record supports a finding that defendant released and then reapplied the pressure to the child's neck. The pathologist also opined it would have taken a considerable amount of time, perhaps 10 minutes, to inflict all of the injuries the child suffered.

On this record, we conclude there is substantial evidence about the nature of the killing from which a reasonable jury could infer that the *manner* of killing was "so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer." (See *People v. Anderson*, *supra*, 70 Cal.2d at p. 27.)

9

Finally, the evidence that defendant also used a ligature further supports a finding of deliberation and premeditation, particularly in light of the evidence that defendant also had used her hands to strangle the child.

Defendant disputes such a finding, relying heavily on *People v. Rowland* (1982) 134 Cal.App.3d 1. We conclude *Rowland*'s holding that ligature strangulation does not demonstrate a deliberate and premeditated intent unconvincing and unsupported by subsequent decisions of our high court, which have consistently held that ligature strangulation is evidence of premeditation and deliberation. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 12, citing *People v. Davis*, *supra*, 10 Cal.4th at p. 510; *People v. Hovarter*, *supra*, 44 Cal.4th at pp. 1019–1020; *People v. Stitely* (2005) 35 Cal.4th 514, 544.) Even if *Rowland* is still good law, it is inapplicable here. In *Rowland*, no testimony was presented regarding any attack prior to strangulation or how long it took the victim to die from strangulation. In the present case, the evidence supports the finding that defendant attacked the child multiple times over a possibly 10-minute period that ended with her strangling him to death. Such evidence supports a finding of premeditation and deliberation.

Defendant also contends that the forensic evidence only shows an unconsidered and frenzied attempt by a stressed mother to silence a crying child. Such an inference might have been drawn by a reasonable fact finder, but as a court of review our task at hand is to review the record in light of the findings made by the trier of fact, as opposed to making new findings based on other evidence in the record. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60 [noting under the substantial evidence standard of review, we

will not disturb a jury's finding "simply because the circumstances might also reasonably be reconciled with a contrary finding"].)

## DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

PRAGER, J.[*]

---

[*]     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.